**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| JOSEPH RAPPOLD, <br><br> PLAINTIFF <br><br> v. <br><br> MAINEHEALTH d/b/a MAINE MEDICAL CENTER, <br><br> DEFENDANT. | Civil Action No. _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Dr. Joseph Rappold submits this Complaint against Defendant MaineHealth d/b/a Maine Medical Center ("MMC" or "Defendant") for violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (the "ADA"), and the Main Human Rights Act, 5 M.R.S.A. §§ 4551 et seq. (the "MHRA").

**PRELIMINARY STATEMENT**

1.  This case concerns a disturbing decision by MMC to terminate Dr. Rappold, an experienced and high-performing physician, after he received a difficult medical diagnosis and sought basic accommodations under the ADA and MHRA.

2.  Dr. Rappold is a Navy veteran and medical doctor with a lengthy and impressive resume, consisting of decades of service as a physician and surgeon in both the military and private practice.

3.  After joining MMC in 2015, Dr. Rappold ascended through the ranks, culminating in his appointment as Director of Trauma in 2016 and to the Vice Chair of the Department of Critical Care in 2019.

4. In June 2020, Dr. Rappold was blindsided with a diagnosis of Parkinson's Disease ("PD"), a neurodegenerative condition that he knew could, at least in the future, compromise his ability to continue to safely perform surgeries on his patients.

5. In early 2022, Dr. Rappold began to experience symptoms resulting from his PD and therefore requested an accommodation from MMC that would allow him to focus on his administrative duties, rather than his surgical duties, which, at that time, made up only a marginal component of his job.

6. Moreover, to the extent MMC was unable or unwilling to restructure his existing position, Dr. Rappold identified and applied for a to-be vacant position at MMC that was fully administrative, and that, by MMC's own admission, Dr. Rappold was qualified for and capable of performing.

7. To his surprise, however, MMC leadership refused to meaningfully engage with Dr. Rappold in response to his requested accommodations. Instead, MMC demanded that Dr. Rappold formally release MMC from claims under the ADA and MHRA as a condition to offering him any accommodations at all.

8. When Dr. Rappold refused to sign a release, MMC terminated his employment.

9. Thereafter, MMC hired a candidate for the administrative position who was demonstrably less qualified and who was not, in MMC's view, tainted with a degenerative medical diagnosis, like Dr. Rappold.

10. Accordingly, and for the reasons set forth more fully herein, Dr. Rappold brings claims against Defendant for violations of the ADA and MHRA.

**PARTIES**

11. Plaintiff Dr. Joseph Rappold is an individual who resides in Portland, Maine.

12. Defendant MaineHealth d/b/a Maine Medical Center is a non-profit corporation organized under Maine law and with a principal place of business in Maine.

## JURISDICTION & VENUE

13. This Court has subject matter jurisdiction over Dr. Rappold's ADA claim pursuant to 28 U.S.C. § 1331.

14. This Court has supplemental jurisdiction over Dr. Rappold's MHRA claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Dr. Rappold's federal claims, the claims derive from a common nucleus of operative fact as Dr. Rappold's federal claims, and the exercise of supplemental jurisdiction would be in the interest of judicial economy, convenience, fairness, and comity.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendant has its principal places of business in this district and the practices alleged to be unlawful were committed within the jurisdiction of this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. On or about January 30, 2023, Dr. Rappold filed a timely Complaint of Discrimination against Defendants alleging unlawful disability discrimination with the Maine Human Rights Commission ("MHRC"), which was deemed joint filed with the Equal Employment Opportunity Commission ("EEOC") pursuant to a work-sharing agreement between the MHRC and the EEOC.

17. On February 23, 2024, the MHRC issued a Notice of Right to Sue with respect to Dr. Rappold's state law claims.

18. On February 29, the EEOC issued a Notice of Right to Sue with respect to Dr. Rappold's claims under the ADA.

19.     Accordingly, Dr. Rappold has exhausted his administrative remedies with respect to all claims set forth in this complaint.

## FACTUAL ALLEGATIONS

### Dr. Rappold's Background and Employment with MMC

20.     Dr. Rappold is a board-certified physician and retired naval officer who has specialized in surgery for three decades.

21.     After spending six years as a nuclear submarine officer, Dr. Rappold obtained his medical degree from Temple University in 1991, followed by a surgical residency at the Naval Medical Center in San Diego, California from 1994 to 1998.

22.     Dr. Rappold then spent the subsequent eleven years serving in the Navy in various prestigious positions, including a stint as ship's surgeon on the supercarrier U.S.S. Abraham Lincoln and tours of duty in both Iraq and Afghanistan.

23.     At the conclusion of his decorated naval career, Dr. Rappold served as an attending physician in acute care surgery and in the surgical intensive care unit at Temple University Hospital from 2011 to 2015, where he also served as Director of Surgical Research.

24.     Dr. Rappold has also experienced a notable career as a medical academic, during which time he delivered several keynote speeches at academic conferences, authored numerous papers, studies, and scholarly articles, and served as Associate Professor of Surgery at Temple University School of Medicine from 2011 to 2015.

25.     In June 2015, MMC hired Dr. Rappold as its director of Surgical Research.

26.     Thereafter, Dr. Rappold rose rapidly through the ranks at MMC.

27.     Specifically, in September 2015, shortly after he started, Dr. Rappold was named Co-Director of the Cardiovascular Critical Care Service. He thereafter became Chief of Acute Care

Surgery in May 2016 and then served as Trauma Medical Director from 2016 to 2022, during which time he led two Level I American College of Surgeons reverifications in 2017 and 2020. Both recertifications were approved with distinction.

28. In 2018, Dr. Rappold gained the additional title of Vice Chair of Critical Care Medicine ("Vice Chair"). As Vice Chair, Dr. Rappold had a multitude of responsibilities, including administrative, clinical, and surgical duties.

29. Notably, Dr. Rappold's surgical duties made up only a small and marginal portion of his overall job responsibilities, with other non-surgical components, including management, administration, research, education, and directorial and clinical duties making up the vast majority of his role.

### Dr. Rappold is Diagnosed with Parkinson's Disease

30. In June 2020, Dr. Rappold was diagnosed with early-stage Parkinson's disease ("PD"), a neurodegenerative condition that causes unintended or uncontrollable movements such as shaking, stiffness, and difficulty with balance and coordination.

31. For approximately the next 18 months, Dr. Rappold experienced, at most, only mild symptoms of PD, and he was able to continue performing all of his job duties without accommodation.

32. In or around early 2022, however, Dr. Rappold began to experience more noticeable symptoms, such as tremor and loss of dexterity.

33. Therefore, out of an abundance of caution—and after consulting with his doctor—Dr. Rappold voluntarily withdrew from his surgical duties pending discussions with MMC on how he might continue performing his job with a medical accommodation.

34. During this time, Dr. Rappold continued to perform all other essential functions of

his job without accommodation, as such duties were not impacted in any way by his PD.

35. Notably, MMC did not object, at least initially, to Dr. Rappold withdrawing from his surgical duties, nor did his withdrawal have any material impact on MMC's business.

**Dr. Rappold attempts to engage in an interactive process with MMC regarding an accommodation for his PD**

36. Shortly after withdrawing from his surgical duties, Dr. Rappold submitted to MMC a form document titled: "Information Request for Determination of Need for Reasonable Accommodation" (the "First Accommodation Request").

37. As part of the First Accommodation Request, Dr. Rappold provided MMC with notes from his treating neurologist, which stated that Dr. Rappold was permanently disabled and that his PD "limits his ability to perform certain fine manipulations that are required in the course of performing surgery."

38. Nevertheless, Dr. Rappold advised MMC that his PD manifested exclusively in the form of physical symptoms, namely involuntary hand tremors, and that he did not suffer from any cognitive impairments.

39. In fact, the neurologist notes submitted to MMC specifically stated that Dr. Rappold's "ability to perform non-operative patient management tasks is not affected at this time."

40. As such, the First Accommodation Request invited MMC to engage in an interactive process to determine what accommodations might be available that would allow Dr. Rappold to continue working at MMC.

41. In particular, Dr. Rappold proposed that his job be modestly restructured to remove him from his surgical duties and allow him to continue performing the management, administrative, and critical care responsibilities of his position.

**MMC Refuses to Engage with Dr. Rappold in a Good Faith Interactive Process**

42. After submitting the First Accommodation Request, Dr. Rappold received no response from MMC for more than a month.

43. Thereafter, on April 7, 2022, Dr. Rappold met with MMC leadership to discuss his request for an accommodation.

44. During the meeting, however, the MMC leadership team declined to discuss any accommodation for Dr. Rappold; instead, the team merely discussed their desire to replace Dr. Rappold and reallocate his job responsibilities to others.

45. Specifically, Dr. Brian Nolan, the MMC Chair of Surgery, expressed his belief that Dr. Rappold would need a replacement to fulfill his critical care duties, notwithstanding the note from Dr. Rappold's neurologist stating that his PD would not impact his non-surgical duties.

46. During the same meeting, Dr. David Seder, Chief of Critical Care at MMC, raised unsubstantiated concerns that Dr. Rappold could suffer from potential cognitive issues related to his PD, a fact which was not only untrue but conflicted with the medical notes Dr. Rappold had provided to MMC weeks earlier.

47. Ultimately, during the April 7 meeting, the MMC leadership team never even considered accommodations that it might be able to provide Dr. Rappold.

48. Nevertheless, Dr. Rappold continued to attempt to engage MMC in an interactive process as part of an effort to secure an accommodation.

49. In particular, Dr. Rappold met with Dr. Kenneth Lombard, Chief of Clinical Affairs for MaineHealth Medical Group and Chief Medical Officer for Maine Medical Partners, to discuss medical accommodations.

50. During each meeting, however, Dr. Lombard informed Dr. Rappold that MMC

would not entertain any reasonable accommodation that would allow Dr. Rappold to continue working full-time.

## MMC Refuses to Transfer Dr. Rappold
## to a Vacant Position for Which He Was Qualified

51. At or around this time, Dr. Rappold became aware that MMC's Vice Chair of Perioperative Medicine ("VCPM") would soon be vacating her position and that MMC was actively seeking a replacement for her.

52. Notably, the VCPM position is entirely administrative, and Dr. Rappold was eminently qualified for it given his years of experience as Vice Chair of Surgery.

53. In fact, Dr. Rappold would have been able to perform all essential functions of the VCPM position with or without reasonable accommodation.

54. On June 15, 2022, Dr. Rappold emailed Dr. Nolan and stated that he would like to be considered for the VCPM position.

55. On June 16, 2022, Dr. Rappold emailed Dr. Joel Botler, the Chief Medical Officer for MMC, as well as Dr. Lombard, to express the same sentiment, namely that the VCPM position was "entirely administrative," that he was "uniquely qualified to fill it," and that "this vacancy would fully accommodate [his] medical condition and would allow us to move forward."

56. Dr. Botler responded to Dr. Rappold's email by saying, "I certainly agree this is a job you could do," expressed his appreciation for Dr. Rappold's interest in the position, and encouraged him to apply for it, which Dr. Rappold did.

57. Rather than transfer Dr. Rappold to the vacant VCPM position, less than one month later, MMC sent Dr. Rappold a proposed agreement pursuant to which it purported to offer him an accommodation but only on the condition that he endorse an agreement purporting to release MMC for, inter alia, violations of the ADA and MHRA (the "Proposed Release").

58. Dr. Rappold refused to sign the Proposed Release.

59. Then weeks later, on July 11, 2022, MMC terminated Dr. Rappold's employment.

60. More than two months after his termination, in or around September 2022, Dr. Nolan informed Dr. Rappold that another candidate was chosen for the position, who Dr. Nolan described as "a slightly better fit at this time."

61. Upon information and belief, the individual selected for the VCPM position did not have any prior experience performing management or administrative roles in her career and had only completed her postdoctoral fellowship a mere six years prior.

62. As such, Dr. Rappold was more qualified for the VCPM position than the candidate ultimately chosen by MMC.

**COUNT I: Failure to Accommodate a Disability under the ADA**

63. Dr. Rappold incorporates the preceding paragraphs by reference.

64. MMC is an "employer" within the meaning of 42 U.S.C. § 12111(5)(A).

65. Dr. Rappold was, at all relevant times, an "employee" within the meaning of 42 U.S.C. § 12111(4).

66. At all relevant times, Dr. Rappold was "disabled" within the meaning of the ADA; that is, Dr. Rappold had a physical impairment that substantially limited major life activities, including but not limited to walking, standing, performing manual tasks, and climbing stairs.

67. At all relevant times, Dr. Rappold was also "regarded as" having a disability within the meaning of 42 U.S.C. § 12101(1)(C).

68. At all relevant times, Dr. Rappold was a "Qualified Individual" within the meaning of 42 U.S.C. § 12111(8); that is, Dr. Rappold was able to perform the essential functions of the position that he held or desired, with or without a reasonable accommodation.

69. MMC was aware of Dr. Rappold's disability and did not reasonably accommodate it.

70. Moreover, MMC was aware or should have been aware of reasonable accommodations that it could have provided to Dr. Rappold, including but not necessarily limited to restructuring his position to eliminate his surgical duties and/or transferring him to the vacant, or soon to be vacant, VCPM position.

71. As a direct and proximate result of Defendant's violations of Dr. Rappold's rights under the ADA, Dr. Rappold suffered substantial damages, including but not limited to the loss of his job and corresponding income.

## COUNT II: Discrimination under the ADA

72. Dr. Rappold incorporates the preceding paragraphs by reference.

73. MMC is an "employer" within the meaning of 42 U.S.C. § 12111(5)(A).

74. Dr. Rappold was, at all relevant times, an "employee" within the meaning of 42 U.S.C. § 12111(4).

75. At all relevant times, Dr. Rappold was "disabled" within the meaning of the ADA; that is, Dr. Rappold had a physical impairment that substantially limited major life activities, including but not limited to walking, standing, performing manual tasks, and climbing stairs.

76. At all relevant times, Dr. Rappold was also "regarded as" having a disability within the meaning of 42 U.S.C. § 12101(1)(C).

77. At all relevant times, Dr. Rappold was a "Qualified Individual" within the meaning of 42 U.S.C. § 12111(8); that is, Dr. Rappold was qualified and able to perform the essential functions of the position that he held or desired, with or without a reasonable accommodation.

78. MMC discriminated against Dr. Rappold because of his disability in ways that

include but are not necessarily limited to: refusing to select Dr. Rappold for the VCPM position for which he was qualified in favor of a less qualified and, upon information and belief, a nondisabled candidate, and terminating his employment.

79. As a direct and proximate result of Defendant's violations of Dr. Rappold's rights under the ADA, Dr. Rappold suffered substantial damages.

## COUNT III: Interference under the ADA

80. Dr. Rappold incorporates the preceding paragraphs by reference.

81. MMC is an "employer" within the meaning of 42 U.S.C. § 12111(5)(A).

82. Dr. Rappold was, at all relevant times, an "employee" within the meaning of 42 U.S.C. § 12111(4).

83. At all relevant times, Dr. Rappold was "disabled" within the meaning of the ADA; that is, Dr. Rappold had a physical impairment that substantially limited major life activities, including but not limited to walking, standing, performing manual tasks, and climbing stairs.

84. At all relevant times, Dr. Rappold was also "regarded as" having a disability within the meaning of 42 U.S.C. § 12101(1)(C).

85. At all relevant times, Dr. Rappold was a "Qualified Individual" within the meaning of 42 U.S.C. § 12111(8); that is, Dr. Rappold was qualified and able to perform the essential functions of the position that he held or desired, with or without a reasonable accommodation.

86. During Dr. Rappold's employment, MMC coerced, intimidated, threatened, or interfered with Dr. Rappold's exercise or enjoyment of—or on account of his having exercised or enjoyed—his rights protected under the ADA in ways that include but are not limited to: declining to engage in a good faith interactive process and mandating that he endorse a release of rights as a condition to receiving an accommodation.

87. In engaging in those acts described in Paragraph 86, MMC was motivated by an intent to discriminate and/or an intent to coerce, intimidate, threaten, or interfere with Rappold's ADA rights.

88. As a direct and proximate result of Defendant's violations of Dr. Rappold's rights under the ADA, Dr. Rappold suffered substantial damages.

### COUNT IV: Failure to Accommodate under the MRHA

89. Dr. Rappold incorporates the preceding paragraphs by reference.

90. At all relevant times, MMC was an "employer" within the meaning of 5 M.R.S.A. § 4553(4).

91. At all relevant times, Dr. Rappold was an "employee" within the meaning of 5 M.R.S.A. § 4553(3).

92. At all relevant times, Dr. Rappold had a "disability" within the meaning of the 5 M.R.S.A. § 4553-A.

93. At all relevant times, Dr. Rappold was regarded as having a "disability" within the meaning of 5 M.R.S.A. § 4553-A.

94. At all relevant times, Dr. Rappold was a "Qualified individual with a disability" within the meaning of 5 M.R.S.A. § 4553; that is, Dr. Rappold was able to perform the essential functions of the position that he held or desired, with or without accommodation.

95. MMC was aware of Dr. Rappold's disability and did not reasonably accommodate it.

96. Moreover, MMC was aware or should have been aware of reasonable accommodations that it could have provided to Dr. Rappold, including but not necessarily limited to restricting his position to eliminate his surgical duties and/or offering him the VCPM position.

97. As a direct and proximate result of Defendant's violations of Dr. Rappold's rights under the MHRA, he suffered substantial damages including but not limited to the loss of his job and corresponding income.

98. Defendants intentionally violated the MHRA with malice and/or with reckless disregard for Dr. Rappold's rights.

## COUNT V: Discrimination under the MHRA

99. Dr. Rappold incorporates the preceding paragraphs by reference.

100. At all relevant times, MMC was an "employer" within the meaning of 5 M.R.S.A. § 4553(4).

101. At all relevant times, Dr. Rappold was an "employee" within the meaning of 5 M.R.S.A. § 4553(3).

102. At all relevant times, Dr. Rappold had a "disability" within the meaning of the 5 M.R.S.A. § 4553-A.

103. At all relevant times, Dr. Rappold was regarded as having a "disability" within the meaning of 5 M.R.S.A. § 4553-A.

104. At all relevant times, Dr. Rappold was a "Qualified individual with a disability" within the meaning of 5 M.R.S.A. § 4553; that is, Dr. Rappold was able to perform the essential functions of the position that he held or desired, with or without accommodation.

105. MMC discriminated against Dr. Rappold because of his disability in ways that include but are not necessarily limited to: refusing to select Dr. Rappold for the VCPM position for which he was qualified in favor of a less qualified and, upon information and belief, a nondisabled candidate and terminating his employment.

106. In engaging in those acts described in Paragraph 105, MMC was motivated by an

intent to discriminate and/or an intent to coerce, intimidate, threaten, or interfere with Rappold's ADA rights.

107. As a direct and proximate result of Defendant's violations of Dr. Rappold's rights under the MHRA, he suffered damages including but not limited to lost income, inconvenience, humiliation, and loss of enjoyment of life.

### COUNT VI: Interference under the MHRA

108. Dr. Rappold incorporates the preceding paragraphs by reference.

109. At all relevant times, MMC was an "employer" within the meaning of 5 M.R.S.A. § 4553(4).

110. At all relevant times, Dr. Rappold was an "employee" within the meaning of 5 M.R.S.A. § 4553(3).

111. At all relevant times, Dr. Rappold had a "disability" within the meaning of the 5 M.R.S.A. § 4553-A.

112. At all relevant times, Dr. Rappold was regarded as having a "disability" within the meaning of 5 M.R.S.A. § 4553-A.

113. At all relevant times, Dr. Rappold was a "Qualified individual with a disability" within the meaning of 5 M.R.S.A. § 4553; that is, Dr. Rappold was able to perform the essential functions of the position that he held or desired, with or without accommodation.

114. During Rappold's employment, MMC intimidated, threatened, or interfered with his exercise or enjoyment of—or on account of his having exercised or enjoyed—his rights protected under the MHRA in ways that include but are not limited to: declining to engage in a good faith interactive process and mandating that he endorse a release of rights in exchange for receiving an accommodation.

14

115. As a direct and proximate result of Defendant's violations of Dr. Rappold's rights under the MHRA, he suffered damages including but not limited to lost income, inconvenience, humiliation, and loss of enjoyment of life.

116. Defendants intentionally violated the MHRA with malice and/or with reckless disregard for Dr. Rappold's rights.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Rappold respectfully requests that the Court enter judgment in his favor granting him legal and equitable relief as the Court may deem just, including, but not limited to:

   a. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

   b. Order Defendant to transfer Dr. Rappold to a full-time position at MMC or, alternatively, award front pay to Plaintiff;

   c. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

   d. Award equitable relief for back pay, benefits and prejudgment interest;

   e. Award compensatory damages in an amount to be determined at trial;

   f. Award punitive damages in an amount to be determined at trial;

   g. Award attorney's fees, including legal expenses, and costs;

   h. Award prejudgment interest;

   i. Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability; and

   j. Grant to Plaintiff such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all triable issues pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  April 5, 2024.

                Respectfully submitted,

                /s/ Richard L. O'Meara
                Richard L. O'Meara
                MURRAY PLUMB & MURRAY
                75 Pearl Street, P.O. Box 9785
                Portland, ME 04104-5085
                207-773-5651
                romeara@mpmlaw.com

                Joshua L. Jewett (VSB No. 76884)
                Benjamin D. Johnson (VSB No. 90812)
                PIERCE JEWETT, PLLC
                1111 E Main Street, Suite P120
                Richmond, Virginia 23219
                Tel: 804-413-4021
                Fax: 757-257-0387
                jjewett@piercejewett.com
                bjohnson@piercejewett.com

                *Pro hac vice forthcoming*